IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | |
| PENNSYLVANIA DELIVERY SYSTEMS, | * | Chapter 7 |
|     Debtor | * | |
| | * | Case No.: 1-04-bk-07680MDF |
| PENNSYLVANIA DELIVERY SYSTEMS | * | |
| and FRANCIS C. MUSSO, P.C., | * | |
|     Movants | * | |
| | * | |
| v. | * | |
| | * | |
| OFFICE OF THE UNITED STATES | * | |
| TRUSTEE and MARKIAN SLOBODIAN, | * | |
| Trustee of the Chapter 7 Estate, | * | |
|     Objectants | * | |

## OPINION

### Procedural and Factual History

Before the Court are objections filed by the United States Trustee ("UST") and the chapter 7 Trustee to the application to employ the firm of Francis C. Musso ("Musso") as a business consultant for Pennsylvania Delivery Systems ("PDS"), the debtor-in-possession in the within case.

On December 30, 2004, PDS, a small, regional trucking company based in Middletown, Pennsylvania, filed a petition under chapter 11 of the Bankruptcy Code. On February 10, 2005, PDS filed an application (the "Application") to employ Musso *nunc pro tunc* as of January 5, 2005. The Application, dated February 10, 2005, stated that Musso was being employed to analyze PDS's financial affairs and sought broad approval for Musso to provide accounting and "operational management services" to the debtor-in-possession. Attached to the Application was an agreement signed by Musso and "accepted and agreed to" by Thomas R. Carbonaro ("Carbonaro"), President of PDS, detailing the services to be provided (the "Engagement

Letter"). The Engagement Letter also was "accepted and agreed to" by Carbonaro and his wife Kathleen Carbonaro (collectively, "the Carbonaros") as individuals. Musso initially presented Carbonaro with a retention agreement in January 2005 that did not include the fee guarantee. However, after analyzing PDS's financial condition, Musso became concerned about the viability of the company and submitted a revised retention agreement – the Engagement Letter. The Engagement Letter stated that Musso was representing both PDS and the Carbonaros personally and stated that the Carbonaros would guarantee the payment of Musso's fees up to $25,000.00 and provide collateral to secure the payment of the fees. The Engagement Letter further provided that "[t]o avoid our firm having an interest adverse to PDS' bankruptcy estate such as might disqualify us . . . , your wife and you agree . . . that you will not seek to be reimbursed by the bankruptcy estate for any amounts paid by you to our firm under your guarantee and suretyship." Blurring the distinction between PDS and the Carbonaros, the Engagement Letter provided that "[a]s most of the services will involve PDS in some fashion, we will apply to the bankruptcy Court for employment in the Pennsylvania Delivery Systems, Inc. case."

On February 17, 2005, the UST filed an objection to Musso's employment application. The objection averred that the Carbonaros together hold unsecured claims totaling over $301,000.00 against PDS.[1] According to the UST, this substantial claim creates a conflict of interest for Musso, who was employed to represent the interests of both the debtor-in-possession

---

[1] Schedule "F" for unsecured non-priority claims shows that Kathleen holds an unsecured claim against PDS in the amount of $43,014.00 while Carbonaro holds an unsecured claim in the amount of $258,936.00.

2

and the Carbonaros. The UST argues that the conflict is further compounded by the guarantees given by the Carbonaros to ensure the payment of Musso's fees.

On March 1, 2005, PDS filed a motion to approve an agreement to lease its rolling stock to Brothers Trucking Company, Inc. ("BTI")[2] in order to assemble the stock for auction. Although styled as a lease agreement in the motion, the document for which PDS sought approval was denominated as an "Operating Agreement." It provided that in addition to moving the rolling stock, BTI would have the ability to exercise other rights, such as the option to hire PDS employees, purchase PDS equipment, and obtain PDS customer information. The Operating Agreement was entered into in contemplation of PDS winding down and eventually terminating its operations. Carbonaro decided to close the business and auction the equipment in February 2005 after he met with Arthur Shafer of the Musso firm and Edward H. Brothers, Jr. ("Brothers"), the president and sole shareholder of BTI. At some point between these meetings and the hearing on March 14, 2005, Carbonaro became BTI's vice-president for sales.

On March 4, 2005, the UST filed an objection to PDS's motion to approve the Operating Agreement with BTI and moved to convert the case from chapter 11 to chapter 7. On March 14, 2005, a hearing was held on PDS's motion to approve the Operating Agreement, the application to appoint an auctioneer, the motion for post petition financing, and the motion to convert. Finding that PDS had ceased operations and that the Operating Agreement could not be approved as an arms length transaction, the Court determined that the case should be converted to chapter

---

[2]BTI Company filed a chapter 11 petition on September 4, 2003. Its plan of reorganization was confirmed on January 6, 2006.

7. Immediately after conversion of the case, Markian Slobodian (the "Trustee") was appointed as trustee for the chapter 7 estate.

On March 14, 2005, Musso filed an application for $23,425.00 seeking compensation for services performed for PDS between December 31, 2004 and March 4, 2005. Both the Trustee and the UST filed objections to Musso's fee application.

The objection to Musso's application for employment was heard by the Court on June 20, 2005. Because a ruling on the UST's objection to the employment application would determine the disposition of the fee application if the retention application were denied, the Court reserved a determination under 11 U.S.C. § 330(a) pending a ruling under Section 327. *See In re Bolton-Emerson, Inc.*, 200 B.R. 725 (D. Mass. 1996) (valid appointment by court is condition precedent to grant of application for compensation). The transcript and briefs of the parties have been filed, and the matter is ripe for decision.[3]

## Discussion

A debtor-in-possession may employ professionals, including accountants as restructuring advisors, "that do not hold or represent an interest adverse to the estate, and that are disinterested persons . . . ." 11 U.S.C. § 327(a). These standards are imposed upon the employment of bankruptcy professionals to prevent conflicts of interest which "erode the public confidence in the administration of justice in bankruptcy courts." *In re Fretheim*, 102 B.R. 298, 299 (Bankr. D. Conn. 1989). Thus, any professional employed by a chapter 11 debtor-in-possession must meet a two-part test to qualify for employment. The professional must not "hold or represent an

---

[3] I have jurisdiction to hear this matter pursuant to 28 U.S.C. §§157 and 1334. This matter is core pursuant to 28 U.S.C. §157(b)(2)(A) and (O). This Opinion constitutes findings of fact and conclusions of law made under Fed. R. Bankr. P. 7052.

4

interest adverse to the estate" and must be a "disinterested person." *In re BH &P Inc.,* 949 F.2d 1300, 1314 (3d Cir. 1991); *See, also, In re Star Broadcasting, Inc*., 81 B.R. 835, 838 (Bankr. D. N.J. 1988). Section 101(14) of the Bankruptcy Code defines at some length the meaning of a "disinterested person" under 11 U.S.C. §327(a).[4] Section 101(14)(E) states that a "disinterested person" is one who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders by reason of any direct or indirect relationship to, connection with, or interest in, the debtor . . . . or for any other reason." 11 U.S.C. § 101(13(E). The first part of the test under Section 327(a) specifies that the professional may not hold or represent an interest adverse to the estate, which provides a broader basis for disqualification than disinterestedness because the professional not only must not *hold* an interest adverse to the estate, he also must not *represent* an adverse interest.

Courts tend to analyze whether a professional has an interest materially adverse to the interest of the estate in the context of conflicts of interest. *Collier on Bankruptcy*, 15th Ed.,

---

[4](14) "disinterested person" means person that--
> (A) is not a creditor, an equity security holder, or an insider;
> (B) is not and was not an investment banker for any outstanding security of the debtor;
> (C) has not been, within three years before the date of the filing of the petition, an investment banker for a security of the debtor, or an attorney for such an investment banker in connection with the offer, sale, or issuance of a security of the debtor;
> (D) is not and was not, within two years before the date of the filing of the petition, a director, officer, or employee of the debtor or of an investment banker specified in subparagraph (B) or (C) of this paragraph; and
> (E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph, or for any other reason;

5

327.04[3]. The criteria for analyzing adverse interests in the Third Circuit are outlined in *In re Marvel Entertainment Group, Inc*., 140 F.3d 463, 476 (3d Cir. 1998). In *Marvel Entertainment*, the Circuit held that:

> (1) Section 327(a), as well as 327(c), imposes a per se disqualification . . . of any [professional] who has an actual conflict of interest;
> (2) the [bankruptcy] court may within its discretion – pursuant to § 327(a) and consistent with 327(c) – disqualify [a professional] who has a potential conflict of interest and
> (3) the [bankruptcy] court may not disqualify [a professional] on the appearance of conflict alone.

*Id.* More recently, the Third Circuit held that while the appearance of impropriety standing alone is not sufficient to disqualify a professional, in some situations, a potential conflict and the appearance of conflict alone may justify disqualification. *In re Congoleum Corp.*, 426 F.3d 675, 692 (3d Cir. 2005).

"A Court may consider an interest adverse to the estate when [the professional] has 'a competing economic interest tending to diminish estate values or to create a potential or actual dispute in which the estate is a rival claimant.'" *In re First Jersey Securities, Inc.*, 180 F.3d 504 (3d Cir. 1999) *citing In re Caldor, Inc*., 193 B.R. 165, 171 (Bankr. D.S.N.Y. 1996)(where trustee objected to retention of counsel by official committee of unsecured creditors in chapter 11 case); *Star Broadcasting*, 81 B.R. at 838 (court held law firm held actual conflict of interest in representing related debtors-in-possession).

A professional is not barred from being employed by a debtor-in-possession simply because the professional also is employed by a creditor of the debtor-in-possession. "[A] person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case, the court shall disapprove such employment *if there is an*

6

*actual conflict of interest.*"  11 U.S.C. §327(c) (italics added.)

"The term 'actual conflict of interest' is not defined in the Code and has been given meaning largely through a case-by-case evaluation of particular situations arising in the bankruptcy context. Courts are accorded considerable latitude when determining whether an actual conflict exists 'in light of the particular facts of each case.'" *In re BH & P*, 949 F.2d at 1313; *In re Hoffman,* 53 B.R. 564, 566 (Bankr. W.D. Ark. 1985).  *BH&P* held that the "actuality" of a conflict is "the possibility that the [professionals] would favor one estate over the other in their attempt to serve all of them." *Id.* at 1315 (citing *In re Michigan General,* 78 B.R. 479, 483-84 (Bankr. N.D. Tex. 1987) ("The 'actuality' of the conflict is . . . that counsel will be tempted to neglect its duties to the estate by being less than zealous . . . ."). In *dicta,* the *BH&P* Court stated that employment would not necessarily need to be disapproved if, for example, the possibility that a potential conflict will become an actual conflict is remote, or if the field of competent professionals is so small for the given case that finding another professional who is "disinterested" would be virtually impossible. *Id.*  The Court concluded its discussion by noting that even where the possibility that a potential conflict will be actualized is remote, employment of a professional with a potential conflict is disfavored. *Id.*

Under 11 U.S.C. § 328 (c) a conflict of interest that exists at any time after the filing of the bankruptcy petition can be cause for denial of fees.  *See generally In re Guard Force Management, Inc.* 185 B.R. 656, 664 (Bankr. D. Mass. 1995) (attorney not disinterested when motion to employ filed, therefore could not be employed.)  Section 328(c) specifically provides that "the court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 or 1103 of this title if, at any time during

7

such professional person's employment under section 327 or 1103 of this title, such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate . . . ." 11 U.S.C. § 328(c).

Applying these factors to the instant case, I find that at the time Musso's application for employment was filed, there was an actual conflict of interest arising from Musso's simultaneous representation of PDS and Brothers[5] in connection with the lease/operating agreement. Further, there also was a potential conflict of interest sufficient to warrant disapproval of the application as a consequence of Musso's simultaneous representation of PDS and Carbonaro.

    A.    *Dual representation of PDS and Brothers*.

Musso testified that in December 2004 he began representing Brothers, whose company, BTI, filed a chapter 11 petition in 2003. After he was approached by Carbonaro about providing work out services to PDS, he initiated negotiations between Carbonaro and Brothers regarding a possible merger of the two trucking companies. The Operating Agreement provided, *inter alia*, that Carbonaro would be employed by BTI, that PDS would be paid a commission for a year on "opportunities" brought to BTI, that BTI would be given the opportunity to hire PDS employees and purchase certain equipment, and that BTI would rent tractors from PDS. Musso apparently recognized that by facilitating this agreement, he had a conflict of interest and requested

---

[5]Francis Musso testified that he did not represent BTI, but only Brothers individually. While Musso may have made such statements in good faith, the Court finds that since Brothers executed the Operating Agreement as president of BTI, Musso's firm clearly was performing services on behalf of BTI when he negotiated the Agreement.

8

Carbonaro and Brothers to sign a waiver agreement, which they did on or about February 24, 2005.[6]

Section 327(a) provides that a professional with an actual conflict of interest is disqualified *per se.* A professional employed under Section 327(a) "assumes a fiduciary responsibility to refrain from rendering any unauthorized service in furtherance of an interest adverse to the client he serves by court appointment." *See In re Kendavis*, 91 B.R. at 753 (citing *Wolf v. Weinstein*, 372 U.S. 633, 641, 83 S.Ct. 969, 975, 10 L.Ed.2d 33 (1963)). Musso does not dispute that he has a conflict, in fact he acknowledges that his independence is compromised because he represents the interests of both PDS and Brothers. He asserts, however, that because the conflict was disclosed to both Carbonaro and Brothers, and they agreed to waive the conflict, he was qualified to be retained as a professional and to seek compensation from the estate. But such waivers are ineffective in a chapter 11 case in which the debtor-in-possession is a fiduciary. *See In re Git-N-Go, Inc.*, 321 B.R. 54 (Bankr. N.D. Okla. 2004)(conflicts waivers, while necessary to satisfy rules of professional conduct, do not rectify prohibited adverse interests). "A fiduciary . . . may not perfect his claim to compensation by insisting that, although he had conflicting interests, he served his several masters equally well or that his primary loyalty was not weakened by the pull of his secondary one." *Woods v. City Nat'l Bank & Trust Co.*, 312 U.S. 262, 269, 61 S.Ct. 493, 497, 85 L.Ed. 820 (1941). Counsel for PDS was informed of the

---

[6]Musso explained the reasons for the execution of the conflicts letter as follows: "It's not uncommon that we might have two clients that have similar interests, one buying, one selling, often merging, where we actually introduce the clients and may answer their questions. And the letter expresses the fact that we represent both, and that they should rely on – and that they realize we represent both and they should rely on counsel for their independence, because we can then no longer provide that independence." N.T. at 70.

9

negotiations leading to the execution of the Operating Agreement, but it is clear that both Brothers and Carbonaro were relying on Musso's expertise during the negotiations and not the advice of counsel. Therefore, even without considering the UST's argument that Musso had a conflict of interest stemming from the concurrent representation of Carbonaro and PDS, I find that at the time he was retained by PDS, Musso had an actual conflict of interest because of his employment by Brothers.

   *B.  Dual representation of PDS and Carbonaro*

  A professional may be employed concurrently by a debtor and a creditor under certain conditions.[7] Dual representation is acceptable if no actual conflict exists and the likelihood that an actual conflict will develop is remote. *In re BH &P Inc.,* 949 F.2d at 1316-1317. If there is a conflict of interest, or if it is likely that interests of the debtor and creditor will become adverse, a professional may not represent both parties. *In re Neidig Corp.* 113 B.R. 696 (D. Colo. 1990)(law firm represented corporate president in matters directly impacting assets available to bankruptcy estate); *In re Hoffman*, 53 B.R. 564 (Bankr. W.D. Ark. 1985)(professional owed duty of loyalty to the corporation and not to officer of corporation).

  In a closely-held corporation like PDS, a professional must work with an officer who may fail to distinguish his own self interest from that of the corporation. When the officer is also a creditor of the corporation, the possibilities increase that an adverse interest will develop. The Engagement Letter executed by the Carbonaros and Musso clearly provided that Musso represented both PDS and the Carbonaros. Musso testified that he withdrew from representing

---

   [7]11 U.S.C. § 327(c) authorizes the employment by a debtor of a person who represents a creditor of the estate unless there is an objection by another creditor or the UST and the court finds that there is an actual conflict of interest.

10

the Carbonaros, which contradicts the explicit provisions of the Engagement Letter. Carbonaro testified that he believed Musso represented him personally, as well as PDS, and that Musso never informed him that Musso had withdrawn from representing him personally. Given the clarity of the language of the Engagement Letter, Musso's testimony could have been excluded under the parole evidence rule if an objection had been raised. *See Penn West Associates, Inc. V. Cohen*, 371 F.3d 118, 130 (3rd Cir. 2004)("parole evidence is excluded in contracts cases when the plain language is clear"). The testimony of both Carbonaro and Musso was self-serving and illustrates the difficulties that arise when a professional attempts to serve two masters. Once the business failed, Carbonaro had no incentive to support the application for Musso's retention, which he originally filed on behalf of PDS. Therefore, he readily supported the objections filed by the UST and the Trustee. Conversely, Musso sought to avoid disqualification as a professional to protect his ability to enforce the Carbonaros' guarantee. I find the best evidence as to the scope of Musso's representation to be the Engagement Letter itself, which clearly provides that Musso represented the Carbonaros and PDS.

Carbonaro is a shareholder of PDS and one of its creditors. As a condition of his employment, Musso required Carbonaro and his wife to guarantee payment of his fees. He apparently believed that his firm would have an interest adverse to PDS if the Carbonaros sought reimbursement from the bankruptcy estate for any amounts paid to Musso under the guarantee. It is unclear why this particular aspect of the arrangement was troubling, but it suggests that Musso was aware of the dangers inherent in concurrently representing both PDS and the Carbonaros.

It is not unusual for the principal of a corporation to advance funds for payment of a retainer to a professional employed to represent the estate. This practice is not prohibited

11

because an officer or shareholder frequently is the only available funding source, and the court usually can determine whether the interests of the debtor and its principal are aligned at the initiation of the case. But the requirement that the Carbonaros guarantee payment of the fees, even if disallowed by the court, created a greater potential for future conflict. The Engagement Letter provided that Musso would provide assistance in developing a plan of reorganization for PDS. If the case had proceeded to the plan development stage, Musso would have had a strong incentive to develop a plan that promoted the interests of the Carbonaros, to whom he also owed a duty, in order to protect the fee guarantee. The Engagement Letter also provided that he would develop a payment structure for secured, priority and unsecured debt, which would place him in the position of determining the classification and treatment of the Carbonaros' claims. I find that the dual representation of Carbonaro and PDS coupled with the fee guarantee provision created a potential conflict of sufficient magnitude as to warrant disapproval of Musso's application for retention. However, in this case, I need not rely on this finding alone. Once Musso initiated discussions between PDS and Brothers in January 2005, the potential adverse interests he represented ripen into an actual conflict.

12

**Conclusion**

Musso's multiple roles in this case illustrate the difficulties of balancing efficiency and non-bankruptcy practices with competing concerns of fairness to all parties and the integrity of the bankruptcy process.  In this case, the balance tips in favor of disqualification.

For these reasons, the Court concludes that the application for employment should be denied.  An appropriate order will follow.

BY THE COURT,

Mary D. France
Bankruptcy Judge

Date:   March 3, 2006

*This electronic order is signed and filed on the same date.*

13